UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| GREGORY P. WARGER, | ) | CIV. 08-5092-JLV |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART |
| | ) | AND DENYING IN PART |
| vs. | ) | PLAINTIFF'S MOTION FOR |
| | ) | COSTS AND FEES |
| RANDY D. SHAUERS, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the court pursuant to plaintiff's motion for costs
and fees incurred as a result of a mistrial in the above-captioned case.  (Docket
109).  Defendant resists the motion.  (Docket 113).  The court allowed briefing
and oral argument on this matter, which is ripe for adjudication.

**FACTS AND PROCEDURAL HISTORY**

The court limits its recitation to those facts necessary to resolve
plaintiff's pending motion.  The court's recitation constitutes its findings of fact
in support of this order.  Additional findings of fact are contained in the court's
discussion of the relevant case law and application to this case.

This case arises from a collision that occurred on August 4, 2006,
between plaintiff Gregory P. Warger, who was operating a motorcycle, and
defendant Randy D. Shauers, who was operating a pickup truck with an
attached camper trailer.  (Docket 1 at ¶¶ 5 & 6).  The collision occurred on U.S.
Highway 385 in Pennington County, South Dakota.  Id. at ¶ 7.  On March 12,

2010, the court entered a scheduling order setting the dates for pretrial submissions, the pretrial conference, and the jury trial. (Docket 24). Pretrial submissions, including motions *in limine*, were due by July 6, 2010; the pretrial conference was scheduled for July 13, 2010; and the jury trial was set to begin on July 20, 2010. (Docket 24).

As part of his pretrial submissions, plaintiff filed a motion *in limine* to exclude, in relevant part, any reference to the South Dakota Highway Patrol accident report completed by Trooper David Berkley and any opinion or testimony from Trooper Berkley "regarding the accident, how it occurred, or who is at fault." (Docket 50 at p. 1). Plaintiff argued the accident report lacked the necessary trustworthiness to be admitted as a public record under Fed. R. Evid. 803(8)(C). (Docket 51 at pp. 1-3). Plaintiff also argued Trooper Berkley's opinion testimony was the result of guesswork and mere speculation and lacked the foundation required of expert testimony under Fed. R. Evid. 702. Id. at pp. 3-4. Defendant resisted the motion. (Docket 63).

On July 13, 2010, the court began a three-day joint pretrial conference and motions hearing. On July 14, 2010, the court heard oral argument on plaintiff's motion *in limine*, but reserved ruling until Trooper Berkley testified. (Docket 73). On July 16, 2010, Trooper Berkley testified as to his professional experience and training, his observations at the scene immediately following the collision, the procedures used to investigate the collision and preserve and collect evidence, and the taking of statements from defendant and eyewitness

Clint Elmore. (P.C.T. pp. 2-23).[1] Trooper Berkley also testified as to his opinions regarding how the collision occurred and who was at fault and the basis for his opinions. (P.C.T. pp. 24-27, 31-62). In relevant part, Trooper Berkley discussed the basis for his opinion that plaintiff entered U.S. Highway 385 from the south fork of the Y intersection at Sheridan Lake Road. Trooper Berkley testified he based his opinion primarily on information provided by defendant, not by evidence available at the scene of the collision. (P.C.T. p. 31, lines 1-22). Indeed, Trooper Berkley testified he was unsure as to which fork of the intersection plaintiff used to enter the highway. (P.C.T. p. 31, lines 23-25).

After carefully considering Trooper Berkley's testimony within the framework of Fed. R. Evid. 702 and 803(8)(C) and relevant case law, the court granted in part and denied in part plaintiff's motion *in limine* with respect to Trooper Berkley's accident report and opinion testimony. (P.C.T. p. 63, lines 7-25; p. 64, lines 1-5). The court provided the following explanation for its ruling:

> With regard to plaintiff's motion in limine number 1 seeking to exclude the South Dakota Highway Patrol accident report completed by Trooper David Berkley, I am going to grant the motion in limine and exclude the report. I specifically asked the lieutenant in box 14 where the lieutenant indicated the driver one, which in his report that's the plaintiff, Mr. Warger, failed to yield to vehicle. He based that on the configuration of the road to the presence of the stop sign. 3. The fact the crash occurred. And 4. The South Dakota statute regarding failure to yield.

---

[1]The court obtained a transcript of the portion of the pretrial conference containing Trooper Berkley's testimony. The court will refer to this transcript as "P.C.T." followed by the page number(s) and line number(s) where the corresponding information may be found.

I find that this is not a matter of credibility, this is a matter of reliability and trustworthiness. The report is not reliable in its entirety because the trooper did not, in order to reach his conclusions and findings in the report, did not apply accident reconstruction methodology to reach his conclusions and findings. He did not know crucial facts from objective sources regarding the conduct of each driver. The trooper did not have enough data available from objective sources to which he then applied accident reconstruction methodology to reach his conclusions and findings. That renders his report unreliable.

This is not a question of the completeness of his investigation, this is a matter of the data upon which the lieutenant relied in reaching his conclusions and making his findings.

With regard to the speed and the action of each driver, with regard to speed the only information which the lieutenant had at the time was from an interested party and that is Mr. Shauers, the driver of the pickup pulling the camper. The lieutenant did not testify that he considered the Elmore statement in reaching his conclusions and findings in his report. And frankly, that statement, if you read it, is not sufficient information or data upon which the conclusions and findings in the motor vehicle traffic accident report could be based. Therefore, the traffic accident report and its field notes which are the initial document prepared by the lieutenant are not admissible as public records under Federal Rule of Evidence 803(8)(C) because they lack trustworthiness.

Again, that's not a question of credibility of the witness, it is a question of admissibility because I determined the report is neither reliable nor trustworthy.

With regard to plaintiff's motion in limine number 2, which seeks to exclude any opinion or testimony from Trooper Berkley regarding the accident, how it occurred, or who was at fault, I am going to grant that motion in part and deny it in part. The trooper can testify regarding the accident but in doing so, he cannot testify regarding fault or causation. He cannot testify as to the finding he made in box 14 that the motorcycle driver Warger failed to yield. The trooper cannot testify about the speed of either vehicle, Warger or Shauers. And he cannot -- the trooper cannot relate the statements either of Mr. Shauers or Mr. Elmore because those are hearsay and he's not

testifying about accident reconstruction matters or opinions or conclusions in the nature of expert testimony because I excluded it; therefore, those are hearsay statements. Both witnesses I am advised are going to testify at trial. So that permits the trooper to talk about being called to the scene, and his observations of the scene, his taking photographs. But the areas that I have enumerated he's not to discuss those, be asked questions about them. No reference or inferences are to be made concerning those matters when the lieutenant testifies. And again, those are not matters of credibility of this witness. Lieutenant Berkley is a matter of reliability and trustworthiness of his opinions, conclusions, and findings on the matters that I have excluded.

(P.C.T. p. 64, lines 6-25; p. 65, lines 1-25; p. 66, lines 1-25; p. 67, line 1).

In accordance with its oral rulings, the court filed a written order granting in part and denying in part plaintiff's and defendant's motions *in limine*. (Docket 93). The court granted plaintiff's motion to exclude the South Dakota Highway Patrol accident report completed by Trooper Berkley. Id. at ¶ 3(a). The court granted in part and denied in part plaintiff's motion to exclude any opinion or testimony from Trooper Berkley. Id. at ¶ 3(b). The court allowed Trooper Berkley to testify as to how he was called to the scene of the collision, his observations at the scene, and his photographs of the scene. Id. However, the court precluded his testimony as to who was at fault for the collision, who or what caused the collision, whether plaintiff failed to yield to defendant's vehicle, or the speed of either vehicle. Id. The court also precluded Trooper Berkley from relating statements made by defendant or Clint Elmore because such statements are inadmissible hearsay. Id.

The jury trial commenced on July 20, 2010. (Docket 105). Plaintiff appeared in person and by his counsel, Steven Beardsley and Travis Jones. Id.

5

Defendant appeared in person and by his counsel, Ronald Kappelman and Greg Strommen. Id. On July 21, 2010, Brad Booth, an accident reconstructionist and plaintiff's expert witness, testified before the jury. Id. On July 22, 2010, during cross-examination, Mr. Kappelman asked Mr. Booth a series of questions:

> Q: And Mr. Elmore testified in front of this jury that he didn't indicate on there whether he pulled out of the north -- Warger pulled out of the north forth or south fork of the Y. You heard that testimony?
>
> A: I did.
>
> Q: Yet you are telling us that you read into it that he pulled out of one fork or the other?
>
> A: When you take a left and proceed south and are going to go back to the east, it would seem to me that would be the only logical conclusion you could come to.
>
> Q: I see. Did you speak to Lieutenant Berkley, the investigating officer, about what logical conclusion he came to?

(T.T. p. 8, lines 11-23).[2]

Mr. Jones objected to this last question. (T.T. p. 8, line 24). The court stated, "There's a prior court ruling on this subject. Not knowing what the answer would be, I am going to sustain the objection." (T.T. p. 8, line 25; p. 9, lines 1-2). Mr. Kappelman resumed his cross-examination of Mr. Booth.

---

[2]The testimony of Mr. Booth on July 22, 2010, appears in Volume III of the transcript of the jury trial. The court will refer to this transcript as "T.T." followed by the page number(s) and line number(s) where the corresponding information may be found.

Shortly thereafter, Mr. Kappelman asked to approach the bench in order to obtain clarification of the court's ruling on an unrelated evidentiary matter. (T.T. p. 17, lines 18-20). Mr. Kappelman, Mr. Jones, and the court attempted to engage in a discussion on this matter, but could not make a proper record due to technological difficulties with the sound system, particularly with the white noise and the court reporter's headphones. (T.T. p. 21, lines 21-25; p. 22, lines 1-4). As a result, the court excused the jury to conduct a hearing. (T.T. p. 22, lines 4-7). During this hearing, Mr. Kappelman and the court engaged in the following pertinent discussion:

> [MR. KAPPELMAN:] Lastly, I want to say that during part of my examination I was trying to establish that Mr. Booth, through his investigation, had talked with the investigating officer, and the investigating officer had thought that Mr. Warger came out of the south fork of the Y and the Court prevented me from doing that. And so I want -- I need to make sure whether I can even go into with Mr. Booth, who has personally visited with the trooper and read his report and seen his diagram, that simple question. I am not asking for causation, I am asking for: isn't it true that the trooper thought he came out of the south fork of the Y?

> THE COURT: I want to make two clarifications on the three-point presentation you just made. Starting with the final point, the question you asked was the subject of plaintiff's objection which I sustained based on a prior ruling. That question, whether you intended to frame it that way or not, called for this witness to state Trooper Berkley's opinion with regard to the cause of this collision. The question was clear as a bell to me as to how a witness would truthfully answer that. That has been excluded. Trooper Berkley's opinion with regard to the cause of this collision was excluded last week, and so that's not coming in. That's why I sustained that objection. I am not accusing you of intentionally trying to violate the order in any way, but the question you asked would have required that as an answer, so that's the matter with that sustained objection.

(T.T. p. 23, lines 20-25, p. 24, lines 1-22).

The court and counsel proceeded to discuss other matters. At the conclusion of the hearing, Mr. Booth again took the stand, and the jury returned to the courtroom. (T.T. p. 32, lines 8-17). The court advised Mr. Booth he was still under oath and asked Mr. Kappelman to resume his cross-examination. (T.T. p. 32, lines 18-19). Mr. Kappelman began by asking the following questions:

> Q:    . . . I want to clear one thing up, Mr. Booth. As part of your investigation on this case, you visited with Trooper Berkley, correct?
>
> A:    Correct.
>
> Q:    And you know that Trooper Berkley thinks that Mr. Warger entered 385 from the south fork of the Y, not the north fork of the Y, don't you?

(T.T. p. 32, lines 20-25; p. 33, line 1).

Mr. Jones objected to this last question and requested a bench conference. (T.T. p. 33, lines 2-4). During the bench conference, he moved for a mistrial, arguing Mr. Kappelman violated the court's *in limine* order by including Trooper Berkley's opinion in his question to Mr. Booth. (T.T. p. 33, lines 8-15). Mr. Jones argued the question was particularly prejudicial because, during voir dire, at least half of the jury panel inquired as to whether the police had already investigated the collision and determined who was at fault. (T.T. p. 34, lines 24-25; p. 35, lines 1-10). Mr. Jones argued the jury would consider "what the trooper said as gospel." (T.T. p. 35, lines 2-4). In response to the motion for a mistrial, Mr. Kappelman stated as follows:

> My understanding of the -- my understanding was your ruling was you can't talk about what Trooper Berkley legally concluded. I never

8

understood that.  We just went through this.  I thought your ruling was what Berkley could see.  All I am saying is he says he never entered from the south forks [sic] of the Y.

(T.T. p. 33, lines 16-21).

After further discussion, the court and Mr. Kappelman engaged in the following discussion:

THE COURT:  Gentlemen, I have just reviewed the two questions asked by Mr. Kappelman when we resumed with the witness Booth after our earlier break.  It appears that the question of Mr. Kappelman contains a statement which is in violation of the Court's order on plaintiff's motion in limine.  The question is, what's the remedy?  There has been a motion for mistrial.  What's your response?

MR. KAPPELMAN:  I thought -- at the last break I talked to you about what the ruling was.  I thought --

THE COURT:  Mr. Kappelman, your last question before the break was directed towards fault and so I sustained that objection. Therefore --

MR. KAPPELMAN:  I figure at least I could put into evidence that evidence which I am not asking for fault.

(T.T. p. 35, lines 11-25).

The court then excused the jury so the parties could make an appropriate record on the motion for mistrial.  (T.T. p. 36, lines 1-10).  In the hearing that followed, Mr. Kappelman made the following argument in opposition to the motion:

First, let me clear up I think one thing Mr. Jones just said that your order said "nor can anyone refer to Trooper Berkley's conclusions." I read nothing in your order that says what he just represented your order said.  There's no where that it says, "Nor can anyone refer to Trooper Berkley's conclusions."

Our response is this, Your Honor: your order clearly says there's not going to be any opinion or testimony from Trooper David Berkley. Twice in 3B it says Trooper Berkley cannot relate things. He cannot relate his opinions. I think it's pretty clear, Your Honor, that the intent of your order was to preclude Trooper Berkley from coming into this courtroom and saying that one or the other people caused the accident, someone failed to yield. As I think the Court is well aware here, we were mainly arguing on Trooper Berkley about can he come in here and say, "I checked box 14 to say that he failed to yield." I think it's clear that the intent of the Court's order was to preclude Trooper Berkley from coming in here and talking about fault, who caused the collision, whether it was a failure to yield or the speed of either vehicle. That's right in your order. It was not our understanding ever that the Court's order was so broad that we can't even cross-examine their own expert witness about the things he relied upon and didn't rely upon. As you are well aware, Trooper – Mr. Booth visited personally with Trooper Berkley; he wrote him a letter confirming things that they had said and Trooper Berkley did and did not know. He investigated everything about this case. It was never our understanding that we couldn't vigorously cross-examine an expert witness about his opinion and conclusions and how he came to them. Because as the Court knows, Mr. Booth has chosen to pick Mr. Elmore's version of the accident over Mr. Shauers' version of the accident and over the Trooper's determination that he came out of the south fork. It was never our intention, never our understanding that we couldn't go into with their own expert witness what happened out there.

I mean, it seems, Your Honor, we know that Mr. Booth spoke to Trooper Berkley; he relied in part on his investigation and his reports; he chose to adopt the version of Elmore about the north fork of the Y; he chose to disregard Mr. Shauers and Trooper Berkley. And all that is part of his investigation. I certainly, and co-counsel, did not ever understand your order was so broad that we couldn't go into what goes into an expert's opinions, testimony and his opinions.

I will also say this: it was my understanding when we were here earlier this morning and I was asking a similar type of question, the question was sustained, and when we approached the bench the Court said, "Mr. Kappelman, I thought you were going to go into fault." Now, I didn't intend to go to fault; I was trying to show Trooper Berkley thought he came out of the south fork of the Y

according to Mr. Booth's investigation, but I didn't; I backed off of that. It was clearly my understanding I would at least be able to go --

(T.T. p. 40, lines 19-25; p. 41, lines 1-25; p. 42, lines 1-25; p. 43, line 1).

The court then interjected:

I sustained that objection under my ruling which is the subject of this motion in limine, plaintiff's motion in limine, which appears in my order on plaintiff's and defendant's motion in limine, paragraph 3B. I sustained it specifically on that basis and explained that at the bench conference. Go ahead.

(T.T. p. 43, lines 2-7). Mr. Kappelman responded as follows:

Then that was -- I didn't understand the Court's ruling. I thought, Your Honor, that I would not be able to go into fault; I would not be able to go into that failure to yield; none of those conclusions that Trooper Berkley relied upon or came to, that I couldn't go into that, and I didn't go into that. I certainly never understood the Court's ruling was so broad as to preclude me from talking about which fork of the Y the guy came from.

Your Honor, if Trooper Berkley can't -- if I can't talk to their expert witness about this, then, I mean, certainly can I not ask the expert witness didn't Trooper Berkley determine that the accident happened at 385 and Sheridan Lake Road? Didn't he determine that there were skid marks? Didn't he determine where the accident occurred, and put paint down? I mean, if this order is so broad as to say how it occurs means you can't talk about anything, you just -- you can't say anything. But remember, this isn't even Trooper Berkley. It's quite obvious to me, Your Honor, what we are talking about here your order says Trooper Berkley cannot do various things. It was never my understanding that you said Brad Booth and all their witnesses cannot opine on anything.

And I guess here's the bottom line, Your Honor. I did not intentionally stand up here and try to misrepresent anything. This is not as Mr. Jones would represent, this is some sort of a purposeful violation of the Court's order. That was never my intention. I trust that the Court understands that. I was not trying to violate the Court's order. If I inadvertently went where I wasn't suppose to go,

that's all this was. I did not purposely try to do anything here, Your Honor. And this is at best, if you consider a mistake on my part, I didn't understand that I couldn't vigorously examine their own expert witness. He's the one that studied all the materials; he's the one that visited with the trooper; and I never understood I couldn't at least talk about what the trooper and he talked about as far as somebody entered the highway. I mean, it's not like this is a mysterious part of the case that everyone has referred to throughout this trial did he come out of the north fork, did he come out of the south fork? And I don't see how this adds or detracts to any of that. It's cumulative, as he said, as Mr. Jones said, at best. There is a disagreement did he come out of the south or north? Mr. Booth chose to believe Mr. Elmore and disbelieve Mr. Shauers. I think that's where we are at here.

But I just earnestly say, Your Honor, it wasn't my intention to be violating any of the Court's orders, to get it over on anybody; I don't practice law that way. That wasn't my intention to do that here today so I want the Court to know that.

(T.T. p. 43, lines 8-25; p. 44, lines 1-25; p. 45, lines 1-9).

After hearing from Mr. Jones, the court considered the matter under Fed. R. Civ. P. 61, which focuses on harmless error. (T.T. p. 46, lines 24-25; p. 47, lines 1-9). The court found the question posed by Mr. Kappelman clearly violated the court's *in limine* order. (T.T. p. 48, lines 9-25; p. 49, lines 1-25; p. 50, lines 1-7). The court considered its options in dealing with the violation, *i.e.*, give a cautionary instruction or take plaintiff's motion under advisement and rule later. (T.T. p. 50, lines 8-21). The court expressed its concern with these options:

My view is this: it would be like bringing the jury in and looking at them and saying, "Ladies and gentlemen, please think about anything except a blue horse. Do not think about a blue horse, ladies and gentlemen. I instruct you and order you not to think about a blue horse." The human mind would conjure up an image of a blue horse

and it would not go away.  This is a direct comment on a material fact which has been excluded from this trial in the form of an opinion from Trooper Berkley.  A cautionary instruction will not cure the error.

(T.T. p. 50, lines 9-18).

The court was particularly concerned with the great weight the jury would likely place on Trooper Berkley's opinion because he was the investigating officer:

But given the prospective jurors' discussion in voir dire,[3] their belief that a law enforcement officer will solve the material issue by relating his investigation and his opinion as to how this collision occurred; and given the fact that the subject matter contained in Mr. Kappelman's question is the very matter which is a critical element of the jury's responsibility in making a fact-finding as to who was at fault, how this collision occurred, what the behavior was of the plaintiff and the defendant at the time of and prior to the collision, those matters are taken away from them by this question because it is a statement of opinion by Trooper Berkley as to the occurrence of this collision and the behavior of the plaintiff.

(T.T. p. 50, lines 21-25; p. 51, lines 1-9).  The court concluded it must grant a mistrial in the interests of justice and to protect plaintiff's rights.  (T.T. p. 51, lines 10-20).

The jury returned to the courtroom, and the court explained a legal error had occurred that was so serious as to require a mistrial.  (T.T. p. 52, lines 8-

---

[3]"During voir dire examination in this case, a number of the prospective jurors stated the opinion and their view from their experience in life that they expected a law enforcement officer investigated and would come in and tell us, or the parties would have resolved the case based on a law enforcement officer's investigation and opinions and conclusions as to who caused the collision.  And they were told in voir dire by you all [counsel] that we are here because that question is not resolved and it's a question, ladies and gentlemen, you will resolve as judges of the fact."  (T.T. p. 47, lines 23-25; p. 48, lines 1-4).

17).  The court dismissed the jurors with thanks for their service.  (T.T. p. 52, lines 17-25; p. 53, lines 1-4).  In a hearing that followed, Mr. Beardsley requested an expedited trial date and a hearing on the issue of recovering costs and fees associated with the mistrial.  (T.T. p. 53, lines 9-17; p. 56, line 12).  The court ordered briefing on the issue of whether plaintiff was entitled to recover such expenses.  (T.T. p. 53, lines 22-25; p. 54, lines 1-20; p. 56, lines 6-10).

On July 23, 2010, the parties reconvened to calendar the trial and motion hearing.  (Docket 108).  The court rescheduled the trial for September 20, 2010, and scheduled the motion hearing during the pretrial conference on September 13, 2010.  (Docket 107).

On August 9, 2010, plaintiff filed a motion and memorandum for fees and costs and supporting documentation.  (Dockets 109-112).  On August 20, 2010, defendant filed a memorandum and supporting documentation in opposition to plaintiff's motion.  (Dockets 113 & 114).  A hearing on this matter was held on September 13, 2010.  (Docket 142).  The court has considered fully the arguments presented by the parties at the hearing and through their written submissions.

## DISCUSSION

Plaintiff seeks reimbursement only for those expenses that "will necessarily have to be duplicated to retry this case to another jury."  (Docket 110 at p. 7).  Such expenses include travel costs incurred by plaintiff and witness Clint Elmore, expert witness fees charged by Mr. Booth to prepare for

and attend trial, and some, but not all of the attorneys' fees associated with the trial and mistrial.[4]  Id. at p. 8.  Plaintiff seeks a total award of $48,418.72, comprised of $41,671.00 in attorneys' fees and $6,747.72 in costs.  (Docket 111, Exhibit 1).  Plaintiff argues such an award is proper under 28 U.S.C. § 1927 and the court's inherent powers to award sanctions.

## A.    Authority Under 28 U.S.C. § 1927 to Award Fees and Costs

Section 1927 of Title 28 of the United States Code confers upon the court the authority to "require counsel to satisfy *personally* attorneys' fees reasonably incurred by an opposing party when counsel's conduct 'multiplies the proceedings in any case unreasonably and vexatiously.' "  Clark v. United Parcel Service, Inc., 460 F.3d 1004, 1011 (8th Cir. 2006) (emphasis added) (quoting 28 U.S.C. § 1927).  Section 1927 provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.  Black's law dictionary defines "vexatious" as "without reasonable or probable cause or excuse; harassing; annoying."  Black's Law Dictionary 1559 (7th ed. 1999).  It defines "unreasonable" as "[n]ot guided by reason; irrational or capricious."  Id. at 1537.

---

[4]Plaintiff also is seeking reimbursement for paralegal fees.  For convenience, the court will continue to refer to the this category of expenses as "attorneys' fees."

Section 1927 focuses on the conduct of the movant's opposing counsel. Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 724 (8th Cir. 2008); see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 757 (1980) ("[Section] 1927 deals only with attorney conduct and involves taxing costs against counsel.").[5] As explained by the United States Supreme Court, the statute is unique:

> [Section] 1927 does not distinguish between winners and losers, or between plaintiffs and defendants. The statute is indifferent to the equities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes.

Roadway, 447 U.S. at 762. Importantly, § 1927 covers only the *excess* costs, expenses, and attorney's fees incurred by opposing counsel's conduct, not the total costs, expenses, and attorney's fees incurred during the litigation. Id. at 756 n. 3.

The district court must provide an attorney with fair notice and an opportunity to be heard before imposing sanctions under § 1927. Clark, 460 F.3d at 1011 (citing Fuqua Homes, Inc. v. Beattie, 388 F.3d 618, 623 (8th Cir. 2004). Sanctions under § 1927 are not mandatory, but rather are within the sound discretion of the district court. Burull v. First Nat'l Bank of Minneapolis, 831 F.2d 788, 790 (8th Cir. 1987). Because of the district court's

---

[5]At the time the United States Supreme Court decided Roadway, § 1927 focused exclusively on excess *costs* incurred by an attorney's conduct. Roadway, 447 U.S. at 756 n. 3. The Supreme Court found that "costs" did not include attorney's fees. Id. at 762-63. The Court noted Congress was considering legislation aimed at expanding § 1927 to include costs, expenses, and attorney's fees. Id. at 760 n. 8. Indeed, on September 12, 1980, almost three months after the Court decided Roadway, Congress amended § 1927 as reflected in its current version.

" 'intimate familiarity with the case, parties, and counsel[,]' " its determination as to whether sanctions are appropriate is accorded substantial deference. Lee v. First Lenders Ins. Services, 236 F.3d 443, 445 (8th Cir. 2001) (quoting O'Connell v. Champion Int'l Corp., 812 F.2d 393, 395 (8th Cir. 1987)). Courts, however, should be mindful of the fact that "[t]he imposition of sanctions is a serious matter and should be approached with circumspection." O'Connell, 812 F.2d at 395. "Because section 1927 is penal in nature, it should be strictly construed so that it does not dampen the legitimate zeal of an attorney in representing his client." Lee v. L.B. Sales, Inc., 177 F.3d 714, 718 (8th Cir. 1999) (citation and internal quotation marks omitted).

Sanctions under § 1927 are appropriate when counsel's conduct, " 'viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court.' "[6] Clark, 460 F.3d at 1011 (quoting Tenkku v.

---

[6]Prior to the Clark decision, it was unclear if § 1927 also required a finding of bad faith. See, e.g., NAACP-Special Contribution Fund v. Atkins, 908 F.2d 336, 340 (8th Cir. 1990) ("This court has indicated that the language of § 1927 appears to require both a finding of objectively unreasonable behavior and a finding of bad faith."); O'Connell, 812 F.2d at 395 n. 2 ("We do not hold that § 1927 contains only an objective standard, as opposed to both an objective and subjective standard. The words of the statute require unreasonable *and* vexatious conduct. 28 U.S.C. § 1927. Whether this requires a finding of bad faith in addition to unreasonable conduct is a question that is not before us."). In Clark, the Court of Appeals for the Eighth Circuit clarified the standard by which a district court may award sanctions under § 1927. The sanctioned attorney argued § 1927 required a finding of both objective unreasonableness and subjective bad faith, relying on *dicta* in NAACP. Clark, 460 F.3d at 1008. The Eighth Circuit seemed to reject this argument, stating "[o]ur subsequent holdings make clear, however, that the statute permits sanctions when an attorney's conduct, 'viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court.' " Id. (quoting Tenkku, 348 F.3d at 743).

Normandy Bank, 348 F.3d 737, 743 (8th Cir. 2003)).  "Reckless" is defined as lacking in caution, foresight, or consideration, or deliberately courting danger. Webster's New International Dictionary 1896 (3d ed. 2002).  Words synonymous with "reckless" are "foolhardy," "rash," "careless," "neglectful," "thoughtless," "improvident," and "irresponsible."  Id.  Black's law dictionary defines "reckless disregard" as "[c]onscious indifference to the consequences (of an act)" and "reckless" as "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash."  Black's, supra, at 1276.

The court may assess only those excess costs, expenses, and attorney's fees that bear "a causal connection between the objectionable conduct of counsel and multiplication of the proceedings."  Lee, 236 F.3d at 445 (citation and internal quotation marks omitted).  "[A] sanctioning court must make an effort to isolate the additional costs and fees incurred by reason of conduct that violated § 1927.  But the task is inherently difficult, and precision is not required."  Id. at 446.  Further, when ruling on a motion for sanctions, a district court must make findings of fact to "ensure that the sanctions address the excess costs resulting from the misconduct, provide the sanctioned party an adequate opportunity to respond, and facilitate meaningful appellate review."  Lee, 177 F.3d at 718; see also Tenkku, 348 F.3d at 743 (when imposing sanctions, a district court must make factual findings of misconduct and provide an adequate explanation).

The court does not take lightly the sanctioning of an attorney. The court has considered carefully the record of this case and the legal tenets articulated by the Eighth Circuit and the Supreme Court. The court has provided both parties and their counsel fair notice and a reasonable opportunity to be heard on this issue.

The court considers Mr. Kappelman's conduct objectively as required by the Eighth Circuit. Under this standard, it is clear Mr. Kappelman recklessly disregarded his duty to comply with the court's *in limine* order and subsequent evidentiary rulings. Mr. Kappelman's conduct was both unreasonable and vexatious as contemplated by § 1927.

Mr. Kappelman argues he did not understand the court's *in limine* order precluded any reference to Trooper Berkley's opinion regarding which fork plaintiff used to enter the highway. Let us assume that at the time the court entered its order Mr. Kappelman did not understand the full extent of the court's ruling, and let us assume his lack of understanding was reasonable. However, during the course of the trial, the court fully clarified its ruling on this precise issue. Mr. Kappelman attempted to ask Mr. Booth about Trooper Berkley's opinion, and the court, citing to its *in limine* order, sustained plaintiff's objection. (T.T. p. 8, lines 11-25; p. 9, lines 1-2). Shortly thereafter, Mr. Kappelman asked the court directly if he could ask Mr. Booth if he was aware Trooper Berkley thought plaintiff came out of the south fork of the Y intersection. (T.T. p. 23, lines 20-25; p. 24, lines 1-6). The court clearly and unequivocally stated that precise question called for Mr. Booth to state Trooper

Berkley's opinion as to causation, which was inadmissible pursuant to the court's *in limine* order.  (T.T. p. 24, lines 7-22).

Mr. Kappelman has argued repeatedly that he was not inquiring into causation when he questioned Mr. Booth about Trooper Berkley's opinion. <u>See, e.g.</u>, T.T. p. 24, lines 4-6; p. 42, lines 17-25; p. 43, lines 8-16. Mr. Kappelman obviously takes the position that Trooper Berkley's opinion does not speak to causation.  The court takes the opposite position, which it clearly stated to counsel prior to the events surrounding the mistrial.[7]  Whether Mr. Kappelman agreed with the court's ruling is irrelevant.  Mr. Kappelman had a duty as an officer of the court to comply with the court's ruling.  If Mr. Kappelman did not understand the court's ruling, it was because he *chose* not to understand.  The court does not imply Mr. Kappelman intended to violate the court's *in limine* order or to cause the mistrial.  However, the court believes Mr. Kappelman was so intent on presenting Trooper Berkley's opinion to the jury that, in his zeal, he recklessly violated the court's *in limine* order and subsequent evidentiary rulings.

The court finds Mr. Kappelman was reckless in his consideration of and adherence to the letter and scope of the court's *in limine* order.  Mr. Kappelman seems to argue he believed the court's *in limine* order applied only to testimony provided by Trooper Berkley himself, *i.e.*, *Trooper Berkley* could not express his opinions regarding fault and causation, but *other witnesses* could relay Trooper

---

[7]Whether considered an opinion, a belief, an idea, or a conclusion, Trooper Berkley's subjective thoughts as to the conduct of each driver were not admissible pursuant to the court's *in limine* order.

Berkley's opinions. This argument is fundamentally flawed and disingenuous. Mr. Kappelman is an experienced trial attorney. When ruling on plaintiff's motions *in limine*, the court made clear the purpose of its *in limine* order was to exclude evidence that was untrustworthy or unreliable within the meaning of Fed. R. Evid. 702 and 803(8)(C). The court found Trooper Berkley did not have enough facts from objective sources to properly apply accident reconstruction methodology and did not know crucial facts from objective sources regarding the conduct of each driver. No objective evidence supported Trooper Berkley's opinion as to which fork plaintiff used to enter the highway–Trooper Berkley's opinion was based primarily on information provided by defendant. In fact, at the hearing on pretrial motions, Trooper Berkley testified he truly did not know from which fork plaintiff entered the highway. (P.C.T. p. 31, lines 19-25).

If the court refused to allow *Trooper Berkley* to testify as to his own unreliable opinions, it makes little sense the court would allow *other witnesses* to be the conduit for those same unreliable opinions. Further, during the course of the trial, the court made clear Mr. Kappelman could not ask Mr. Booth about Trooper Berkley's opinion regarding which fork plaintiff used to enter the highway. If Mr. Kappelman had any question as to whether he could submit to the jury Trooper Berkley's opinions through another witness, the court answered the question with a clear and unequivocal "no."

Mr. Kappelman has argued repeatedly "it was never [his] understanding that the Court's order was so broad that [he] could not vigorously cross-examine the Plaintiff's expert witness, Brad Booth, about how he came to his

opinions and conclusions in this case." (Docket 114 at p. 5). The court's *in limine* order and subsequent evidentiary rulings were not intended to impede Mr. Kappelman's cross-examination, but rather to exclude untrustworthy and unreliable evidence. The court has a serious duty to perform as the gatekeeper of evidence, and the court performs its duty objectively, without preference or regard for either party.

In sum, the court finds Mr. Kappelman's conduct to be both unreasonable and vexatious. Mr. Kappelman's claimed lack of understanding of the court's *in limine* order is neither rational nor reasonable because the court explained the extent of its ruling during the trial. There is no reasonable justification or excuse for Mr. Kappelman's lack of compliance with the court's *in limine* order. Further, the court finds Mr. Kappelman recklessly disregarded his duty to the court–his conduct was rash, careless, and lacking in caution or consideration and Mr. Kappelman was indifferent to the consequences of his actions. Consequently, the court finds it appropriate to impose sanctions against Mr. Kappelman pursuant to § 1927.

**B.     Inherent Authority to Award Fees and Costs**

It is well settled that federal courts possess the inherent powers to levy sanctions to, among other aims, curb abusive litigation practices, prevent undue delay in the disposition of cases, protect the orderly administration of justice, and maintain the dignity and authority of the court. <u>Roadway</u>, 447 U.S. at 764-65. "The inherent powers of federal courts are those which 'are necessary to the exercise of all others.' " <u>Id.</u> at 764 (citation omitted). "These

powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (quoting Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962)). Sanctions available to the court range from the severe, *i.e.*, dismissal of an action, to the less severe, *i.e.*, assessment of attorney's fees. Roadway, 447 U.S. at 765.

Although the general rule is that litigants pay their own attorneys' fees, the United States Supreme Court has carved out certain exceptions based on the inherent powers of federal courts to levy sanctions. Id. at 765-66. Courts have the inherent power to assess attorney's fees when a party's litigation efforts directly benefit others, when a party willfully disobeys a court order, or when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258-59 (1975) (citations and internal quotation marks omitted).

The first exception does not apply to this case. The court finds the second exception, willful disobedience of a court order, also does not apply. Willful is defined as "[v]oluntary and intentional, but not necessarily malicious." Black's, *supra*, at 1593. The court previously stated it does not believe Mr. Kappelman intentionally violated the court's *in limine* order.

Only the third exception remains. In exercising its inherent powers, a court may assess attorney's fees against a party *or* counsel who has litigated in bad faith. Roadway, 447 U.S. at 766 ("If a court may tax counsel fees against a

23

party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes."). Bad faith "may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." Id. (citations and internal quotation marks omitted). Sanctions should not be imposed lightly, id. at 767, and the court should exercise its inherent powers "with restraint and discretion." Chambers, 501 U.S. at 44. Before imposing sanctions, a court should provide fair notice and an opportunity to be heard. Roadway, 447 U.S. at 767; see also Chambers, 501 U.S. at 50 (noting courts must comply with the "mandates of due process" before determining that bad faith exists and assessing attorney's fees). Courts have an obligation "to fashion an *appropriate* sanction for conduct which abuses the judicial process." Chambers, 501 U.S. at 44-45 (emphasis added).

The Supreme Court has indicated that a finding of bad faith "would have to precede any sanction under the court's inherent powers." Roadway, 447 U.S. at 767; but see Harlan v. Lewis, 982 F.2d 1255, 1260 (8th Cir. 1993) (limiting the bad faith requirement to the assessment of attorney's fees as a sanction under the court's inherent powers, but finding Roadway did not extend the bad faith requirement to *all* monetary sanctions or "every possible disciplinary exercise" of the court's inherent powers); see also Willhite v. Collins, 459 F.3d 866, 870 (8th Cir. 2006) ("[A]n award of attorneys' fees is permissible under a court's inherent powers as long as the person being sanctioned has demonstrated bad faith."). Bad faith is present if the court finds "that fraud has been practiced upon it, or that the very temple of justice

has been defiled" or that a party delays or disrupts the litigation or hampers enforcement of a court order. <u>Chambers</u>, 501 U.S. at 46 (citations and internal quotation marks omitted).[8] Bad faith has been found when a party intentionally advanced a frivolous argument for the purpose of harassment or delay; when a party pursued an action for no other purpose than to harass or badger the other party; when a party's pleadings were meant to intentionally harm defendant professionally and personally; when a party intentionally destroyed or failed to produce relevant evidence; when a party attempted to conceal relevant evidence; when an attorney deliberately misrepresented material facts; when a party continued to litigate after it became clear the arguments advanced were frivolous, unreasonable, and groundless; when an attorney violated rules of professional conduct; or when a party testified falsely. <u>Books Are Fun, Ltd. v. Rosebrough</u>, 239 F.R.D. 532, 554-58 (S.D. Iowa 2007) (collecting cases).

The court finds Mr. Kappelman's conduct does not rise to the level of bad faith. As stated previously, the court does not believe Mr. Kappelman deliberately or intentionally violated the court's *in limine* order or caused the mistrial. His conduct was reckless, but not done in bad faith. Thus, the court declines to exercise its inherent powers to sanction Mr. Kappelman.

---

[8]The Supreme Court noted the bad faith exception "resembles the third prong of Rule 11's certification requirement, which mandates that a signer of a paper filed with the court warrant that the paper 'is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.' " <u>Chambers</u>, 501 U.S. at 46 n. 10 (quoting Fed. R. Civ. P. 11)

**C.      The Amount of Fees and Costs that Should be Awarded**

The court may impose only the excess attorneys' fees and costs caused by Mr. Kappelman's improper conduct.  Mr. Jones and Mr. Beardsley have provided an itemized log and bills detailing the attorneys' fees and costs incurred by plaintiff.  (Docket 111, Exhibit 1).  Mr. Jones and Mr. Beardsley did not count the attorneys' fees not multiplied by or causally connected to the mistrial.  The court has carefully reviewed the itemized log and bills.  The court finds all of the *costs* incurred by plaintiff are reasonable and will require duplication as a result of the mistrial.  These costs include airfare, lodging, cab fare, and meals for plaintiff; airfare and lodging for witness Clint Elmore; and fees charged by expert Brad Booth to prepare for and attend trial.  Thus, the court orders Mr. Kappelman to reimburse plaintiff in the amount of $6,747.72 in costs.

Attorneys' fees are a more difficult issue.  The fees generated by attending the *first* trial, preparing for and attending the status conference on July 23, 2010, preparing for and attending the *second* pretrial conference and motions hearing on September 13, 2010, and in researching and preparing plaintiff's motion for fees and costs are clearly recoverable.  The difficulty arises with regard to the fees generated by trial preparation.  Plaintiff is seeking reimbursement for nearly all of the trial preparation performed by counsel in association with the first trial.  It is logical some of that preparation would need to be duplicated for the second trial.  However, certainly not all of the trial preparation will need to be duplicated.  Thus, the court will order reimbursement for the following:

| DATE | ATTORNEY | DESCRIPTION | HOURS |
|---|---|---|---|
| 07/20/10 | TBJ | early morning prep; begin trial; opening and begin Elmore examination; prepare for tomorrow | 15.30 |
| | SCB | trial | 12.00 |
| | WEH[9] | prepare for trial; attend trial; work on trial | 10.50 |
| 07/21/10 | TBJ | continue trial; work on redirect of Booth and other preparations for tomorrow with Attorney Beardsley for other witnesses | 15.50 |
| | SCB | trial | 14.00 |
| | WEH | work on trial; attend trial | 12.50 |
| 07/22/10 | TBJ | prepare for trial–day 3; attend trial continued cross-examination of Brad Booth; motion for mistrial granted | 5.30 |
| | SCB | prepare for trial; trial; conference with client after mistrial | 5.50 |
| | WEH | prepare for trial; attend trial; mistrial | 4.00 |
| 07/23/10 | SCB | scheduling hearing; conference with client | 1.30 |
| | TBJ | scheduling hearing; conference with client following hearing; research regarding costs of mistrial | 1.30 |

The total recoverable hours expended by Mr. Jones is 37.4. Mr. Jones charges a rate of $185 per hour in attorney's fees, which the court finds reasonable. Thus, the amount owed by Mr. Kappelman to reimburse plaintiff for Mr. Jones' fees is $6,919.

---

[9]Wendy E. Hanken (WEH) is a paralegal who worked with plaintiff's counsel on this case.

The total recoverable hours expended by Mr. Beardsley is 32.8.
Mr. Beardsley charges a rate of $225 per hour in attorney's fees, which the court finds reasonable. Thus, the amount owed by Mr. Kappelman to reimburse plaintiff for Mr. Beardsley's fees is $7,380.

The total recoverable hours expended by Ms. Hanken is 27. Ms. Hanken charges a rate of $35 per hour in paralegal fees, which the court finds reasonable. Thus, the amount owed by Mr. Kappelman to reimburse plaintiff for Ms. Hanken's fees is $945.

In sum, the court orders Mr. Kappelman to reimburse plaintiff in the total amount of $15,244 for attorneys' fees.

## CONCLUSION

In accordance with the above discussion, it is hereby

ORDERED that plaintiff's motion for costs and fees (Docket 109) is granted in part and denied in part. Pursuant to 28 U.S.C. § 1927, attorney Ronald Kappelman shall reimburse plaintiff in the amount of $6,747.72 in costs and $15,244 in attorneys' fees. Such monies shall be paid within sixty (60) days of the date of this order, unless good cause is shown for an extension.

IT IS FURTHER ORDERED that, within three (3) days of the date of this order, plaintiff shall file a supplemental affidavit itemizing the hours spent by counsel (1) preparing for and attending the September 13, 2010, pretrial conference and motions hearing and (2) researching, drafting, and filing the

motion for costs and fees, supporting affidavits, and the reply brief, to the extent such hours are not included in the previous affidavit (Docket 111).

Dated September 14, 2010.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE